IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-110 |
| | ) | (PHILLIPS/SHIRLEY) |
| JERRY KAY LOWE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on the defendant's Motion to Suppress [Doc. 26], filed on December 15, 2009. The defendant asks the Court to suppress all evidence seized during a warrantless search of his home. The parties appeared for an evidentiary hearing on this motion on February 1, 2010. Assistant United States Attorney A. William Mackie appeared on behalf of the government. Attorney Robert Kurtz represented the defendant, who was also present. The Court heard the evidence and arguments of the parties.

## I. POSITIONS OF THE PARTIES

The defendant stands indicted [Doc. 3] with being a felon in possession of ammunition in and affecting interstate commerce. The defendant contends [Doc. 27] that the April 24, 2009 search of his residence was a warrantless search and was done without his consent.

The government contends the defendant gave consent, both oral and written, before and during the search [Doc. 30].

The defendant denies that he gave oral consent to search his house. Defendant agrees he signed a written consent to search his vehicle only.

## II. SUMMARY OF TESTIMONY

At the February 1, 2010 hearing, the Court heard from three witnesses, Roane County Narcotics Officer John Mayes, the Defendant Jerry Lowe, and a neighbor Geraldine Carmack.

### A.    Testimony of John Mayes

John Mayes testified that he is, and was at the time of the search, a narcotics officer and canine deputy for the Roane County Sheriff's Department. He has had training and experience in narcotics investigations and searches of residences and estimated he had conducted around seventy-five to one hundred (75-100) consent searches. He noted that the policy and procedures of the Roane County Sheriff's Department provided for residential searches pursuant to search warrants, written consent to search, and verbal consent.

The events leading up to the search of the Lowe residence began on the morning of April 24, 2009, around 10:00 a.m., when Officer Mayes received a written offense report from a Deputy Currier about a possible methamphetamine laboratory located at 401 Blue Springs Circle (the defendant's rental residence). The report listed the complainant as Geraldine Carmack. The officers performed a "meth investigation," which included contacting and interviewing Ms. Carmack and running a criminal history on the resident renter, the Defendant Jerry Lowe, Jr. The report

indicated Ms. Carmack was the lessor and Jerry Lowe the lessee of the residence. Ms. Carmack reported that she had personally witnessed the defendant cooking methamphetamine in the residence. She stated she had also observed large amounts of ammonium nitrate in the residence and that her reason for not calling in the past was a concern that her house would be quarantined. The defendant's criminal history record showed defendant had robbery and retaliation charges and a recent charge out of McMinn County for promoting methamphetamine manufacturing. A search of databases indicated the defendant was a recent purchaser of pseudoephedrine.

With this information, Officer Mayes, after consulting with his supervisor, planned to travel to the residence and do a "knock and talk." He traveled to the residence with Deputy Cissom. Upon arrival at the residence, Officer Mayes observed a purple vehicle and a female (later identified as Mrs. Doris Lowe, defendant's wife) outside smoking. Once Mrs. Lowe saw the officers, she ran back in the house. They parked their car and went to the "side door," where Mrs. Lowe had entered. The floor plan (Exhibit 1) of the residence and photos of the residence and the purple vehicle (Exhibit 2) were admitted into evidence.

Officer Mayes then testified he knocked on the door, and when Mrs. Lowe answered, he identified himself as being with the Roane County Sheriff's Department and explained they were there because they had received information about a methamphetamine laboratory at the residence. He asked if she had any objections to a consensual search of the residence, and she replied that she needed to speak with her husband. Officer Mayes testified she left the door open, and he could see her walking to the living area. Officer Mayes then saw the defendant coming from the bedroom area and observed, but did not hear, them speaking. Officer Mayes testified that Deputy Cissom had joined him at the door, that at all times, they remained outside on the porch, and that they were not

demanding to come in.

Officer Mayes testified that Mr. Lowe came to the door and stated "you guys come on in," after which they stepped into the kitchen area and again stated who they were and why they were there (i.e., because they had received information of methamphetamine being generated in the residence). Officer Mayes testified that he then asked defendant for consent to search, and defendant stated, "I have nothing to hide" and "search wherever you want."

Officer Mayes then asked defendant to lead the way, and he followed the defendant as he conducted a "sweep." They started in a storage area (identified on Exhibit 1) where Officer Mayes observed a gallon container of Coleman fuel on a shelf. He took note of it because he was looking for evidence of a methamphetamine laboratory. They next went to the bathroom (also identified on Exhibit 1) and then to the bedroom. In the bedroom, Officer Mayes observed some marijuana "roaches" next to the night stand and also saw some .22 caliber "shells" on the night stand and in a box underneath. A photo of the night stand and the box containing shotgun shells was introduced as Exhibit 3. Officer Mayes then asked defendant if he had any weapons in the house (out of concern that weapons are usually present with drug trafficking). Defendant said he had none and added, apparently by way of explanation, "I'm a convicted felon."

At this point, Officer Mayes said he stopped the search, asked both Mr. and Mrs. Lowe to go into the living room, and asked Deputy Cissom to get a Uniform Consent To Search Form from the police car. Officer Mayes testified no weapons were pulled nor were the Lowes restrained (although at a later time Mrs. Lowe was briefly restrained). He testified they were free to leave.

Officer Mayes testified he went over the consent to search form (Exhibit 4) with

defendant to be sure he understood the nature of the search and his consent. Officer Mayes told defendant he was going to open drawers, look in closets, outbuildings, and clothes. He also told defendant he was looking for drugs and anything illegal. The form was partially filled out by Deputy Cissom and included "11:36 a.m." as the time it was signed.

Officer Mayes testified he read the entire form to defendant, that they did not discuss a car at all, and that the officers were only seeking consent to search the residence. Officer Mayes testified he specifically asked defendant if he felt threatened or if they had done anything to threaten him. Officer Mayes testified the defendant said he did not feel threatened, that he understood the form, and that the officers were "a couple of good guys." He asked defendant to sign and after he did, Officer Mayes told defendant they were now going to do a more thorough search.

Officer Mayes testified that during the search, defendant sat under a window by the door in the living room, and Mrs. Lowe sat in the living room in a kitchen chair. After receiving the consent to search, Mrs. Lowe asked to go to the restroom. Because she appeared to be pregnant, she was permitted to go but told not to flush the commode. She closed both doors to the bathroom and soon thereafter Officer Mayes heard "stuff moving, not consistent with using the bathroom." He told her to come out, which she did immediately. He had her sit back down and asked her if she was trying to hide something. Upon Officer Mayes re-entering the bathroom, he noted the commode seat was still up (as it had been when he first went through) but that some "baby wipes" now appeared out of place. He looked in the "baby wipes" container and found a "meth pipe" or "ice pipe," and some aluminum foil that appeared burnt. To Officer Mayes, this indicated someone had been smoking an illegal substance. At this point, he had Mrs. Lowe handcuffed so she could not dispose of anything and called for a female officer, his supervisor Sergeant Marsha Childs, to search her.

Officer Mayes said he explained to Mrs. Lowe she was just being detained not arrested. He also later let her smoke. Officer Mayes said defendant "fell asleep" under the window.

Officer Mayes testified he then returned to search the bathroom more thoroughly and found Mrs. Lowe's identification and another female's identification. He also found "tickets" issued to defendant regarding the "promotion charge" in McMinn County. He then began to search the bedroom, again saw the marijuana roaches, a tray with "rounds" in it, and a box with "shells" underneath the night stand. He also looked in the closet and saw more "ammo," including a box of .357 rounds and shotgun ammunition, and saw a small crawl space into the attic. He asked Sergeant Childs to look in the attic, and she found two large bags of ammonia nitrate and a "cold pack by-product."

Officer Mayes testified that the evidence seized was listed on his Report Of Investigation (Exhibit 5). He then went over the list, which included a box of Remington shells from the closet "in plain view," a box of .357 rounds next to the shells, a box of .22's on the night stand next to the bed, and a "bottle" of .22 shells, six shells for a 12 gauge shotgun, and some small loose rounds. He also testified he found various "paraphernalia" throughout the house. He did not recall finding anything in the kitchen but found a trash bag in the storage room that contained "components consistent with methamphetamine manufacturing."

Officer Mayes testified they later searched the grounds, including around a well house and pump station. Throughout the search, Officer Mayes testified the defendant was never restrained and was free to leave but was not allowed to receive telephone calls out of concern for officer safety. At the end of the search, defendant left "the residence" with his father. The house was later quarantined for public health reasons because it had contained a methamphetamine

laboratory.

Officer Mayes testified defendant never withdrew his consent nor objected to the search and that when defendant was shown the "ammo" and asked about guns, defendant stated he did not have any guns and that the "ammo" might have been left there before he moved in. Officer Mayes stated after the search, he contacted ATF Agent Kennemer.

On cross-examination, Officer Mayes testified he prepared his Report of Investigation on April 26, 2009, and prepared a "case file." He also had with him Officer Currier's Offense Report and two (2) pages of handwritten notes made at the scene. Officer Mayes explained the letters and numbers on page 1 of his notes, to wit: OCA=our case number; 09=year; 04=the month; 24=the day; 11:36=the time the consent to search was signed; 11:48=time he called his senior officer Detective Mynatt; and 11:58= time he called Detective Mynatt regarding the bags in the ceiling. Officer Mayes also testified that page 2 of his handwritten notes referenced a locked safe, for which defendant had provided the key, and contained the list of items seized from the safe. He also testified about other exhibits and the items listed.

Officer Mayes testified that on the day of the search, he was wearing his uniform and badge. He also had his police dog "Lyka" with him in his car, which was an unmarked, white car without a light rack on the roof. Officer Mayes testified his dog was not taken to the door, nor was the dog ever let out before or during the search. The only time the dog was let out was after the search, and then only for three (3) minutes or so to use the bathroom. Officer Mayes confirmed the dog was never in the house. He did not believe his car had a video camera and did not know whether Officer Cissom's car had a camera. Defendant requested copies of any video or audio recordings from these vehicles, and the government agreed to provide them, if they existed. Officer

Mayes testified the cars were parked on the road and only one was partially in the driveway (as can be seen by the white hood in Exhibit 2). He said that the purple car was not blocked and could have exited the driveway.

Officer Mayes went back over his testimony regarding Mrs. Lowe initially opening the door and confirmed that she never declined to allow the search, that she went and got the defendant, that she met him coming through the kitchen, and that the officers remained entirely outside at that point. Officer Mayes confirmed his report does not state that defendant said "come on in guys" but testified that was based on his memory.

Officer Mayes testified that defendant did ask if they had a search warrant, and when told no, defendant did not refuse to allow the officers to search. Officer Mayes conceded he did not seek a search warrant, because he did not believe he had enough information to constitute probable cause for a search warrant to issue.

He described the first part of the search as a "safety search" and reiterated his earlier observations including the Coleman fuel on top of a cabinet in the storage room and marijuana roaches in the bedroom. He went on to identify the photographs that were made exhibits.

Officer Mayes acknowledged that he did not initially get written consent because he had verbal consent, although written forms were available that day. The subsequent written consent form (Exhibit 4) was discussed, and Officer Mayes was questioned about whether it was really a vehicle consent form rather than a residence consent form. Officer Mayes testified he read the form to defendant and told him the residence was left off the form when it was typed.

Officer Mayes testified the defendant was removed from the house and taken to the well house only after they had found remnants of a methamphetamine laboratory. Officer Mayes

denied the consent to search form was signed at the well house or that it was on a clipboard.  He denied Ms. Carmack being present on the scene but said he saw her four to five (4-5) hours later on the perimeter of the property.  He stated the officers were at the premises almost eight (8) hours.

Officer Mayes testified he told defendant he would obtain a search warrant if that was what the defendant wanted and stated he did have probable cause to get a search warrant after the protective sweep.  Officer Mayes testified defendant signed another document one to two months afterwards, in which defendant stated he had no knowledge of a methamphetamine laboratory being transported in his car.  The government rested its proof.  After reviewing his file, Officer Mayes stated that the defendant signed only the consent form on April 24, 2009.

### B.    Testimony of Jerry Lowe

The defendant offered his proof beginning with his own testimony.  Jerry Lowe testified he is thirty-four (34) years old, and though currently in jail, resides at 401 Blue Springs Circle.  He rented this property, along with his wife, Doris Lowe, from Geraldine Carmack and / or her husband.

He described the events of April 24, 2009 as follows:  He was laying in his bed asleep when his wife ran in stating the police were at the door and wanting to search.  When defendant got to the door, Officer Mayes was standing inside the door saying he needed to search, because he believed there was a methamphetamine laboratory in the residence.  Defendant confirmed that Officer Mayes was cordial and asked for his consent to search but claimed Officer Mayes and Officer Cissom were two to three (2-3) feet inside the door.  Defendant testified his first response was that he had been asleep for two (2) hours, and then he asked if they had a search warrant.

9

Defendant contends that when the officers indicated they did not have a search warrant, that defendant then declined to consent to a search. Defendant stated that Officer Mayes said whether defendant gave consent or not, that they had reason to believe there was a methamphetamine laboratory and they were going to search.

Defendant reiterated that although Officer Mayes said he was going to do a "walk through" that he, defendant, did not consent nor did he accompany Officer Mayes. Defendant confirmed he was asked for consent to search but testified he said "no." Defendant's chronology of the events continued simply with his contention that his wife later went to the bathroom and then was handcuffed. Then they were both taken to the well house by a female officer, Sergeant Childs. He denied that they were free to leave at the well house and testified Officer Mayes had told Sergeant Childs not to let them go. He was not allowed to talk to his father who was sitting up at the road. The officers had been in the house for an hour to an hour and a half (1-1 ½) hours. He denied ever giving consent to search and never signed any consent to search while in the house. Rather he claims that the officer brought a clipboard with consent to search form for his vehicle, a purple Malibu, on it to the well house. Defendant stated the form only addressed his car and never said his house. As such, defendant testified that he understood he was only consenting to a search of his vehicle. He reiterated that he refused consent to search his residence. Defendant testified that after he signed the consent form, the officers searched his car. Defendant stated that sometime later, an officer came out of his house with bullets.

Defendant testified he and his wife were at the well house for about three and half (3½) hours and were there when the hazardous materials crew came out. During that time, he saw Ms. Carmack come onto the front porch of his house, and he saw Officer Mayes "shoo" her away.

On cross-examination, defendant confirmed it was his testimony that Officer Mayes searched for one and half (1½) hours without his consent, that he was at the well house for around three (3) hours, and that he did not sign the consent form until four to five (4-5) hours after the search started. Defendant also contended the form was blank except for the officers' signatures and the address at the bottom of the form. He confirmed the only car to be searched was his car sitting in the driveway.

Defendant again testified about the chronology of events and reiterated his differences with Officer Mayes testimony, including defendant's claim that when he came to the door, Officer Mayes was already three (3) feet inside the doorway; that defendant did not walk around his house with Officer Mayes; that he did not give consent to search, and that Officer Mayes stated he was going to search anyway.

Defendant was also cross-examined about his contact with landlord/witness Carmack during which he testified they discussed the events in issue, but not her testimony, and that he had written her regarding his affection for her.

### C. Testimony of Geraldine Carmack

The next witness called by defendant was Geraldine Carmack. Ms. Carmack testified her boyfriend owns the property where defendant lives, and they rented the property to defendant. She testified that "about 12:10" on April 24, 2009, she became aware of the police presence at the rental house, which is down the street from her home, and went out. She claims she went to the rental house and saw defendant at the well house there but that she kept getting run off. She testified that she saw Officer Mayes approach the defendant with a clipboard in his hands, and she heard him

talking about searching defendant's car. She then stated that it was later in the evening when defendant was at the well house.

On cross-examination, she conceded that although she saw defendant being handed a clipboard, she could not read what was on it from the porch where she was sitting. She also admitted defendant had contacted her since this incident but denied it was for the purpose of influencing her testimony, but only to discuss the events of the day. She could not recall whether specific statements about drug-use testimony might come out.

### III. ANALYSIS

The sole issue before the Court is whether the defendant gave valid oral consent to Officers Mayes and Cissom to search his residence on April 24, 2009. This is an old fashioned swearing contest as Officer Mayes testified under oath that such consent was given and Defendant Jerry Lowe testified under oath that it was not. There does not appear to be any legal dispute, only a factual one.

The law governing this issue is both the general rule that warrantless searches are per se unreasonable under the Fourth Amendment, Katz v. United States, 389 U.S. 347, 357 (1967); Coolidge v. New Hampshire, 403 U.S. 443, 453-54 (1971), and the well-recognized exception to this general rule that a search conducted pursuant to valid consent is permissible under the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). There does not appear to be any of the more typical issues regarding consent including the authority of defendant to give consent (as he was the lessee of the residence), coercion (none was alleged or shown), or voluntariness (no lack of voluntariness was alleged or shown). Rather, the issue boils down to what was said between

the defendant and the officers at the side door of defendant's residence on April 24, 2009.

As heretofore noted, both Officer Mayes and defendant agree that this "situation" began with Officer Mayes approaching the side door and initially discussing his request for consent to search the residence with defendant's wife. They also agree that defendant's wife went and told defendant about the officers' presence and request to search, and that defendant then went to the kitchen area and discussed the matter with the officers. At this point, their testimony diverges.

Officer Mayes testified that he and Deputy Cissom at all times remained outside the door on the porch until defendant invited them in. Defendant, however, contends that upon his arrival the officers were already standing two to three (2-3) feet inside the door. Both agreed that Officer Mayes explained that he was there because he had received information about a methamphetamine laboratory in the residence, and both agreed Officer Mayes asked for consent to search. However, Officer Mayes testified that defendant gave full consent and stated "he had nothing to hide" and told the officers "search wherever you want." Defendant, however, testified that he asked if they had a search warrant,[1] and when the officers indicated they did not, he declined to give consent to a search. He also testified that Officer Mayes then stated that he was going to search anyway, whether defendant gave consent or not, as he had reason to believe there was a methamphetamine laboratory in the residence.

Officer Mayes further testified that he first conducted a "sweep," for officer safety and that he had defendant lead the way through the house. Defendant, however, testified that while Officer Mayes said he was going to do a "walk through," defendant neither consented nor

---

[1]On cross-examination, Officer Mayes agreed defendant asked if they had a search warrant. He testified that he told defendant no but that defendant did not refuse to allow the officers to search.

accompanied Officer Mayes.  During the "sweep/walk through," Officer Mayes testified he saw marijuana roaches next to the night stand and various ammunition.  He also testified that he asked defendant if there were any weapons in the house and that defendant replied there were none and explained he was a convicted felon.  Officer Mayes testified after the sweep and based on what he had observed, he had the defendant sign a consent form.  Officer Mayes said that he went over the consent form in detail with defendant, in his living room, and that he explained he was only going to search the residence.  He testified defendant signed the consent form at 11:36 a.m.

Defendant, on the other hand, testified he neither gave oral consent to search the residence nor signed any consent form while he was in the house.  Rather he claimed the consent form in issue was presented to him, on a clipboard, four to five (4-5) hours after the search began and after he and his wife had been taken to a well house.  He said that the consent form was only for consent to search a vehicle, a purple Malibu.  He further testified that after he signed the consent form, the officers did search the car.

At this point, the Court notes that this consent form (Exhibit 4) is not dispositive of the issue of whether or not the initial consent to enter and search was given because according to either Officer Mayes testimony or defendant's testimony, it was obtained after the initial search. It is however evidence that lends itself to resolution of the consent issue before the Court.

In attempting to resolve the conflicting testimony the Court is unfortunately left with the direct testimony of only Officer Mayes and the defendant.  The Court uses the term unfortunate because it appears both sides could have called potentially corroborating witnesses, Deputy Cissom

for the prosecution and Mrs. Lowe for the defense. Neither were called.[2]

With regard to impeachment, both witnesses had an interest in the legitimacy of the search and a bias regarding their relationship to the litigation and their version of the facts. There was no real showing of prior inconsistent statements or defects in capacity and the only contradictions came from the testimony of the other. With regard to impeachment by evidence of conviction of a crime, the Court finds that defendant was so impeached, and his credibility and character for truthfulness impeached, by virtue of his being a prior felon.[3]

Both Officer Mayes and defendant agree that Officer Mayes specifically asked for consent to search. However, there is little direct evidence, besides their respective testimony, to establish whether defendant's response was yes or no.

Accordingly, the Court must look to circumstantial evidence to make its determination. The Court begins with the fact that Officer Mayes' uncontradicted testimony was that he clearly planned to do a "knock and talk" and sought entry based on consent. He also testified he had done many consent searches in the past. He acknowledged that he chose this method as opposed to obtaining a search warrant because at the time of his initial arrival, he did not believe he had probable cause. Given this uncontradicted testimony and concession, it appears to the Court that

---

[2]The Court notes that after the proof was completed, the parties had rested, and closing arguments were being made, the government's attorney, in response to a question by the Court, offered to call Deputy Cissom. It was proffered he was in the Assistant United States Attorney's office and had been during the entirety of the hearing. Given the late hour, after 5:30 p.m., the fact the proof was closed, and the fact this witness had been available all day, the Court sustained defendant's objection.

[3]The Court notes the lack of direct proof or testimony by Officer Mayes that defendant did have a felony conviction. However, the Court did hear testimony that defendant made an admission he was a previously convicted felon, and this testimony was neither contradicted nor impeached.

Officer Mayes understood that his only means of entry at the time of his arrival was through obtaining consent. As such, it appears unlikely that if consent was emphatically denied, as defendant claims, that this officer would proceed to search knowing he had no legal right to do so and then come to Court and lie, thus putting his reputation, integrity, and potentially his employment on the line. While that is not beyond the realm of belief, there was simply no proof, beyond defendant's own self-serving testimony, to rebut or impeach Officer Mayes' credibility.

The Court is troubled by the fact that Officer Cissom was not called to testify, but the fact that the government did offer to call him, albeit too late, is at least indicative that he would confirm Officer Mayes testimony on the seminal issue of consent. It seems unlikely the government would insist on its right to call him, not knowing if the Court would permit it, if he was going to testify contrary to Officer Mayes on the issue of consent. Assuming that to be true, the Court would have to find that both law enforcement officers were willing to come to Court and lie under oath on this issue. However, because he was not called, and if called would have been subject to being potentially impeached on this or other issues, the Court does not ascribe much weight to this matter, other than the fact this is one portion of the "totality of the circumstances" to be considered.

Other testimony that corroborates Officer Mayes' testimony is the uncontradicted testimony that the officers were able to search the defendant's safe when defendant gave them the keys. This is consistent with defendant having given consent. Additionally, neither Officer Mayes nor defendant testified that defendant ever objected or protested the search for which he allegedly specifically denied consent. Defendant never claimed he protested to Officer Mayes, Deputy Cissom, or even Sergeant Childs, Officer Mayes' supervisor, after she arrived. To the contrary, the uncontradicted testimony of Officer Mayes was that during the search, defendant never objected but

rather fell asleep. Nor was there any indicia of coercion or duress that one might expect if a search was being performed against the explicit wishes of the resident and in the face of a direct denial of consent to search. The defendant offered little testimony regarding what happened after Officer Mayes began his search, and Officer Mayes' uncontradicted testimony that defendant, while in the house, was never restrained, was free to leave, that no weapons were ever drawn, and that Mrs. Lowe was allowed to smoke, seems to this Court to indicate the search being done was consensual and not opposed. While defense counsel on cross-examination implied through questioning that Officer Mayes' police dog may have been in the house, Officer Mayes repeatedly denied such, was never contradicted or impeached on this issue, and defendant never testified to the contrary. In fact, other than the alleged denial of consent, whether he accompanied Officer Mayes during the sweep, and the issue regarding the consent form, defendant's testimony did not contradict Officer Mayes' testimony on any substantive issue.

With regard to the Consent to Search Form, defendant claims he was asked for consent to search his vehicle outside at the well-house, that the form only addressed his car, and that he understood he was only consenting to a search of his vehicle. Officer Mayes' testimony was that the Consent to Search Form was presented to defendant in his living room after the sweep, that he read the form to defendant, that though it mentions vehicles, Officer Mayes told him it was for his residence, and that he explained exactly what the search would entail. Officer Mayes referred to the form as the then "uniform" and "standard" Consent to Search Form used by the Roane County Sheriff's Department. They now use two separate forms, one for a residence and one for a vehicle.

It is obvious that the Consent to Search Form is not a model of clarity. While in the opening paragraph it does state it is an authorization to conduct a search of a "described vehicle <u>or</u>

residence," this language is followed by a "year" and "color" option, then a "make/model or address" option, then "additional descriptive information," and then "registered owner of vehicle or residence" option [emphasis added]. Only the "make/model or address" option was filled in, stating the defendant's address, 401 Blue Springs Circle. Defendant claims that line was not filled in when he signed the form. The second full paragraph reads as follows:

> I have also been advised that it is my right to not allow a search of the vehicle described above and that I may also withdraw the consent given to any time during the search procedure. I have been asked by the above named law enforcement officers to allow a search of the above described vehicle. There have been no threats or promises made to me, and no pressure or coercion of any kind have been used against me. I make this decision rationally and of my own free will.

This paragraph is clearly limited to the search of a vehicle. Finally, the signature line is for the "signature of vehicle owner/operator." However, the defendant did admit he signed the form. The form is dated April 24, 2009, and has as its time of execution 11:36.

There are two aspects of this document that are relevant to the Court's determination. The first has to do with its evidentiary value regarding the initial search. The second has to do with its evidentiary value for the subsequent search after the initial sweep.

With regard to the first aspect, its evidentiary value regarding the initial entry and search, the Court notes that the form clearly evidences a consent to search. Exactly what the consent encompassed is the subject of the Court's analysis of the second aspect, nonetheless the form's evidentiary value regarding the first search is the fact that defendant admittedly was willing to consent to these officers conducting a search of his "property" (real or personal). This is consistent with Officer Mayes testimony that defendant was willing to consent to the initial search of his

residence / real property. It is inconsistent that defendant would deny consent to search his residence and then turn around and sign a Consent to Search Form that mentions "residence" twice and has a place for the "address." Even if defendant thought the consent was only for his vehicle, it seems less consistent that he would deny a search of his residence and then agree to a search of his vehicle. Furthermore, the notes taken at the scene and the case number on those notes are evidence that the Consent Form was signed at 11:36. This is consistent with Officer Mayes' testimony and the time on the form itself, and inconsistent with defendant's testimony that it was signed four to five (4-5) hours after the search started.[4] The Court finds the form was signed at 11:36 a.m. As such, defendant's credibility regarding the timing and location of when and where he signed the form is impeached, and Officer Mayes' testimony is corroborated. Accordingly, the Court finds defendant's entire testimony regarding the Consent Form, including his understanding of what was to be searched, to be impeached and lacking in credibility.

This Court is entitled to credit the testimony of one witness over another's. United States v. Simmons, 174 Fed. Appx. 913, 91 (6th Cir. 2006); United States v. Fisher, 27 Fed. Appx. 558, 560 (6th Cir. 2001) (holding that where there are two permissible views of the testimony at issue, the court is entitled to choose between them, so long as the choice is not "clearly erroneous") (quoting United States v. Ivy, 165 F.3d 391, 401-02 (6th Cir. 1998)). In this instance, the Court also observed the demeanor of the witnesses and found Officer Mayes to be a more credible witness than defendant. The Court credits the testimony of Officer Mayes because he is a member of law

---

[4]Although no start time was given for the search, Officer Mayes testified he was still at the police station at 10:00 a.m. The testimony of Officer Mayes indicated he went to the house soon thereafter. Thus, the initial sweep would likely have begun before noon, and the Consent Form signed immediately after the initial sweep as he testified.

enforcement, has not been shown to be biased in any way, and has not been controverted on any other issue besides those relating directly to the Defendant's consent. See, e.g., United States v. Walls, 116 Fed. Appx. 713, 716 (6th Cir. 2004) (holding that the district court properly made its factual determination that a police officer was more credible than the defendant where their testimony was directly opposite, and the determination was solely a matter of credibility). In contrast, in addition to the Defendant's status as a convicted felon, the Court notes Officer Mayes' testimony that defendant showed up in a database as a recent pseudoephedrine purchaser, had charges pending for promoting methamphetamine manufacturing, methamphetamine components were found in his house, and his house was subsequently quarantined due to methamphetamine production.

For all the above reasons, the Court finds the testimony regarding the Consent to Search Form and the form's contents bolster the credibility of Officer Mayes and diminishes the credibility of the defendant, such that the Court finds that as to the events leading up to the initial sweep that Officer Mayes testimony is more worthy of belief. Therefore, the Court finds that valid consent was given initially by the defendant at the side door for the officers to enter and search the residence.

The second aspect of the Consent to Search Form concerns its validity to authorize the later, more thorough, search of the residence based on consent. Without reiterating, but adopting the foregoing, the Court finds credible and accepts as the Court's finding of fact, Officer Mayes' testimony that the form was signed at 11:36 a.m., in the living room, immediately after the consensual sweep of defendant's residence and after a full review of the form and the nature and extent of the proposed search. Inasmuch, as defendant has conceded he signed the Consent to

Search Form and the Court discounts his testimony regarding where and when he says it was signed, the Court also discredits his testimony regarding what was said to him and what he purported to believe, as either being untrue or objectively unreasonable. As such, the Court finds defendant validly consented and knew he was so consenting to a search of his residence by signing the Consent to Search Form.

The Court also notes that Ms. Carmack's testimony was found by the Court to be irrelevant as to the initial search. The Court finds her testimony regarding the signing of the form to be inconsistent even with defendant's testimony (i.e., as she said it was signed late in the evening) and questions the overall credibility of her testimony. The Court notes the testimony indicated she was the initial complainant regarding the existence of and concern over the methamphetamine laboratory at defendant's residence and reported having personally observed it. Yet in Court, she now testified for defendant and now indicated they were friends. In addition, based on her testimony admitting that defendant had contacted her but claiming it was only to discuss the events of that day, not to influence her testimony and her lack of recall regarding the contents of the letter defendant sent her, along with her demeanor while so testifying, the Court cannot and does not find her testimony to be credible.

## IV. CONCLUSION

Wherefore the Court finds that valid voluntary oral consent was given by the defendant to Officers Mayes and Cissom to initially enter and search defendant's residence at 401 Blue Springs Circle and that thereafter, at 11:36 a.m., valid voluntary written consent was given to search the residence. For the reasons set forth herein, the Court **RECOMMENDS** that the defendant's Motion to Suppress [**Doc. 26**] be **DENIED**.[5]

Respectfully submitted,

_____s/ C. Clifford Shirley, Jr._____
United States Magistrate Judge

---

[5]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).