IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )           No. 3:09-CR-110
                                    )
JERRY KAY LOWE, JR.,                )           (PHILLIPS/SHIRLEY)
                                    )
                Defendant.          )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.  This case is before the Court on the Defendant's Motion to Dismiss

Count Three of the Indictment and for Other Sanctions Against the Government for Destruction of

Evidence [Doc. 68], filed on September 10, 2010.  The Court held an evidentiary hearing on this

motion on October 4, 2010, and continuing on October 8, 2010.  Assistant United States Attorney

A. William Mackie appeared on behalf of the Government.  Attorney Robert R. Kurtz represented

the Defendant, who was also present.  At the conclusion of the hearing, the undersigned took the

motion, the briefs, and the evidence under advisement.


## I.  POSITIONS OF THE PARTIES

On August 24, 2010, the Defendant was charged in a Superseding Indictment [Doc.

57], which alleges that he was a felon in possession of ammunition on April 24, 2009 (Count One);

was a felon in possession of a firearm in April 2009 (Count Two); and possessed equipment,

chemicals, products, and materials, which can be used to manufacture methamphetamine, on April 24, 2009, knowing and intending that such materials would be so used (Count Three).

The Defendant asks [Doc. 68] the Court to dismiss Count Three because the Government's destruction of evidence violated his rights to due process and a fair trial. Alternatively, he asks that the Government be prohibited from introducing any evidence of alleged methamphetamine components that law enforcement officers found in a ditch a mile from his residence. The Defendant states that the defense theory is that these items were put there by someone else and the Defendant had no knowledge of them. He argues that the Government's destruction of items alleged to have been used to manufacture methamphetamine has severely impaired his ability to defend against the charge in Count Three.

The Government responds [Doc.71] that the Defendant's constitutional rights have not been violated and the sanctions he requests are unwarranted. It asserts that law enforcement officers, acting through private contractors, immediately destroyed certain items because they were hazardous materials that posed a threat to public health. Moreover, it contends that all of the items that were retained and tested by law enforcement were preserved and are available to the Defendant for inspection and testing. Thus, the Government argues that the Defendant has not alleged, nor can he show, that the officers destroyed the evidence at issue in bad faith.

## II. SUMMARY OF TESTIMONY

The Government presented the testimony of Special Drug Enforcement Administration (DEA) Agent Phillip Rust, Roane County Sheriff's Deputy John Mayes and Detective Bryan Walker, and Alcohol, Tobbaco, Firearms, and Explosives (ATFE) Agent Dennis

Kennamer.

Special DEA Agent Rust testified that he was trained and certified to investigate methamphetamine laboratories and that he had worked as a methamphetamine laboratory investigator for the DEA for twenty-seven and one-half years. He stated that he had also trained other officers, including officers from the Roane County Sheriff's Department, in the investigation of methamphetamine laboratories. Agent Rust had attended a forty-hour class on the safety standards for handling methamphetamine laboratories and is familiar with the 2009 DEA guidelines for handling methamphetamine laboratories.

Agent Rust testified that when local law enforcement officers find a methamphetamine laboratory, they contact the DEA agent who is on call. The DEA agent calls the hazardous waste unit in Washington D.C. to get an appropriation number, which will be used to pay for cleaning up the site. The DEA agent on call then contacts the hazardous waste disposal contractor, who then responds to the scene. Officers on the scene are to seize the methamphetamine laboratory, assess the level of safety gear required, and then process the laboratory by taking photographs or video footage, preparing an inventory, and collecting samples of controlled substances and non-hazardous materials. Agent Rust stated that other than these samples, all other items at the methamphetamine laboratory are considered to be hazardous or contaminated and must be destroyed. Law enforcement officers are prohibited from taking these hazardous items from the scene. Items from a methamphetamine laboratory are dangerous to the respiratory system, and both the DEA and OSHA have determined that they cannot be safely stored. Ammonium nitrate, used in methamphetamine production, can also be used to make explosives. The hazardous waste contractor packages the items from the methamphetamine laboratory, transports them, and disposes

of them.

On cross-examination, Agent Rust testified that a methamphetamine laboratory is not just a location but includes the components, chemicals, solvents, glassware, and anything else used to manufacture methamphetamine. A truck containing everything the investigating officers will need to process the methamphetamine laboratory responds to the scene. The certified methamphetamine investigator at the scene determines what materials will be collected as samples for testing and what will be destroyed. The DEA policy does not speak to the matter of field testing the evidence, but Agent Rust stated that any field testing would have to be conducted with caution. Once the evidence is processed, the components of the methamphetamine laboratory are immediately taken by the hazardous waste contractor for destruction. Agent Rust agreed that once destroyed, the evidence is no longer available for testing.

Roane County Sheriff's Deputy John Mayes testified that he worked in the narcotics division and that in 2004, he was certified to dismantle methamphetamine laboratories. He stated that he is trained as a site safety supervisor and a clandestine laboratory technician. He said that he is familiar with the DEA policies and procedures regarding methamphetamine laboratories. He has investigated approximately one hundred fifty methamphetamine laboratories since 2004.

Deputy Mayes stated that on April 24, 2009, he was involved in the investigation of a methamphetamine laboratory at 401 Blue Springs Circle, which was the Defendant's residence. Deputy Mayes responded to a complaint by Geraldine Carmack, who said she had observed methamphetamine being manufactured in the house, and searched the residence pursuant to the Defendant's consent. Deputy Mayes found plastic bags with a white residue and glass pipes, both of which field tested positive for methamphetamine. These items were retained as evidence.

Deputy Mayes testified that while the search of the Defendant's residence was ongoing, Mayes learned from his supervisor of a methamphetamine "dump site" on Keylon Hollow Road. Deputy Mayes stated that the Keylon Hollow Road location is two blocks/"less than a mile" from the Defendant's residence. Deputy Mayes contacted Deputy Brian Walker, who is also trained to investigate clandestine laboratories, and asked him to respond to the Keylon Hollow Road location. He then called the DEA. Deputy Walker contacted Mayes from the Keylon Hollow Road site and told Mayes that he had found a "shake and bake" or "one-pot method" methamphetamine laboratory that had recently been thrown out. Deputy Walker told Mayes that the property owner saw the items, believed they were drug-related, and called the police. Deputy Walker stated that he had found ammonia nitrate,[1] lithium batteries, Coleman fuel, tubing and coffee filters at the site.

Deputy Mayes testified that after learning of the methamphetamine laboratory at the Keylon Hollow Road location, he contacted the Tennessee Methamphetamine Task Force to request that the truck[2] respond to the site. He also called the DEA and told them about the methamphetamine laboratory. The DEA contacted Washington and sent a hazardous materials company to handle the clean up. Deputy Mayes then called Deputy Walker and told him that the Task Force truck was en route and that the DEA would call him to let him know who would be responding for clean up. Deputy Walker asked Deputy Mayes for the address of his investigation, which was 401 Blue Springs Circle. Walker told him that he had found a box with that address and

---

[1] Deputy Mayes and Detective Walker called this substance "ammonia nitrate." Agent Rust and Agent Kennamer testified about "ammonium nitrate."

[2] Based upon Detective Mayes' testimony, the Court infers that this is the truck, described by Agent Rust, that contains the supplies and safety gear used by the local officers in processing a methamphetamine laboratory.

the name Geraldine Carmack at the Keylon Hollow Road site. Deputy Mayes contacted DEA a second time to tell them that the two methamphetamine laboratories were connected. The DEA agreed that the same appropriations number could be used for both laboratories.

Deputy Mayes testified that at some point on April 24, 2009, the Defendant's wife Dorris Lowe told him that she had taken laboratory equipment from their home and dumped it on Keylon Hollow Road because she was scared.

Deputy Mayes stated that Eagle Environmental was the hazardous waste disposal contractor that responded to these methamphetamine laboratories. He stated that Eagle collected items from both the Blue Springs Circle residence and the Keylon Hollow Road location for disposal. Deputy Mayes identified a Uniform Hazardous Waste Manifest [Exh. 1] completed by Kelly Johnson of Eagle Environmental, which documented the items that Eagle transported from both sites. Attached to this manifest is a National Clandestine Laboratory Seizure Report, which Deputy Mayes prepared. Deputy Mayes testified that he photographed the items at the Blue Springs Circle location and that Deputy Walker photographed the items at the Keylon Hollow Road location. He said that none of the items appeared to be exculpatory to him.

On cross-examination, Deputy Mayes testified that he was the site supervisor at the Blue Springs Circle location but not at the Keylon Hollow Road location. He said that Deputy Walker decided what items would be tested at the Keylon Hollow Road site, while Mayes made that decision at the Defendant's residence. At the Blue Springs Circle location, Deputy Mayes collected marijuana, Xanax, plastic bags, and glass pipes for testing. He also found ammonia nitrate, which the Defendant identified for him as the contents of a cold pack. He did not field test this item or send it for testing. Also at the Defendant's residence, he found a thirty-two ounce Powerade bottle

containing chemicals and lithium strips. He did not send this bottle to be tested. When he processed these items, he was wearing protective gloves, and he had a respirator on at one point. Deputy Mayes testified that based upon his training, experience, and on DEA policy, he made the decision to destroy the following items found at the Blue Springs Circle location: plastic bottles, ammonia nitrates, lithium strips, sodium hydrochloride, empty blister packs, coffee filters and plastic bags both with residue on them, and parts of batteries.

Deputy Mayes testified that he added coffee filters and changed the amount of Coleman fuel from 128 ounces to 256 ounces on Deputy Walker's handwritten inventory [Exh. 7] of the items found at the Keylon Hollow Road site. Deputy Mayes said that page two of the Laboratory Seizure Report [Exh. 1] shows that 224 ounces of ammonia nitrate was seized. He said that he estimated this quantity from two quart-sized bags of ammonia nitrate from the attic at Blue Springs Road, an amount in two 32 ounce plastic bottles from Blue Springs Road, and the ammonia nitrate scattered around at the Keylon Hollow Road site. He agreed that 224 ounces is equal to approximately fourteen pounds. He testified that the box found on Keylon Hollow Road had Geraldine Carmack's name and the address 385 Blue Springs Road, which is not the Defendant's address, on it.

On redirect examination, Deputy Mayes said that he combined the items from the Blue Springs Road location and the Keylon Hollow Road location on the Seizure Report because Mrs. Lowe told him that the items found on Keylon Hollow Road came from her residence. Thus, he considered the items at the two locations to be from the same methamphetamine laboratory.

Detective Brian Walker testified that he had worked for the Roane County Sheriff's Department for ten years and had been a certified methamphetamine technician since 2002. He

stated that he attended a forty-hour DEA school on how to respond to methamphetamine laboratories and received eight hours of annual training on the subject. He had processed between 80 and 150 methamphetamine laboratories. He stated that "shake and bake" or "one-pot method" of manufacturing methamphetamine was dangerous due to risk of an explosion. He had also been involved in several fires at methamphetamine laboratories and had spoken with persons who had experienced severe burns from cooking methamphetamine. Methamphetamine laboratories typically contain flammable liquids, acids, tubing, Coleman fuel, drain cleaner, coffee filters, and ephedrine.

Detective Walker testified that on April 24, 2009, he was asked to respond to call of a suspected methamphetamine laboratory at 431 Keylon Hollow Road. This location was one and one-half miles from 401 Blue Springs Road, where Deputy Mayes was investigating a methamphetamine laboratory. Detective Walker spoke with the property owner who was at his rental property on Keylon Hollow Road performing some maintenance. Detective Walker found products and containers used in manufacturing methamphetamine that were scattered three to five feet from the shoulder of the road and up an embankment. He testified about photographs [Exh. 4] of the items found, including a Mirro cookware box and a Dell box, a blue duffle bag, fertilizer, solvent, lithium strips, and a container of Coleman fuel in a plastic garbage bag. The Dell cardboard box had a shipping label with the name Geraldine Carmack and the address 385 Blue Springs Circle. When Detective Walker saw flammable liquids and that the Mirro box contained a "one-pot method" methaphetamine cook, he backed away and contacted Deputy Mayes.

Detective Walker stated that pursuant to DEA protocol, the officers contacted the Methamphetamine Task Force truck to come because of the flammable liquids at the site. After talking with Deputy Mayes, he learned that the two methamphetamine laboratories were possibly

connected. Once the Methamphetamine Task Force truck arrived, Detective Walker had the equipment he needed to process the methamphetamine laboratory. Because the "dump" was outdoors, he did not need a respirator. He set the contents of the cardboard boxes and a blue duffle bag out on the ground to be photographed. Detective Walker testified that the photographs show a plastic bag containing the contents of a cold pack or lye, a plastic bag containing fertilizer, coffee filters, plastic baggies, metal tools,[3] a plastic bottle with a tube coming from the cap, which Detective Walker explained was a "gas generator" that allowed its chemical contents to "breathe," a strainer, and Coleman fuel. Detective Walker testified that the fertilizer had been scattered from the edge of the road to the wood line.

Detective Walker testified that while waiting on the hazardous waste disposal contractor to arrive, he took notes documenting the dump site. He considered the items at the Keylon Hollow Road site to be a methamphetamine dump because the methamphetamine was not manufactured at that location. Once Eagle Environmental arrived at the scene, Detective Walker turned the items over to Kelly Johnson for clean up. Ms. Johnson documented the materials collected. Eagle combined the materials from Keylon Hollow Road with those from Blue Springs Circle and transported them from the scene in sealed containers for destruction. Detective Walker did not think that any of the items he found at the Keylon Hollow Road site were exculpatory. Instead, he believed them to be evidence of a methamphetamine laboratory.

On cross-examination, Detective Walker testified that although he found Geraldine Carmack's name on the box he found at Keylon Hollow Road, he did not interview Carmack. Detective Walker was the site supervisor at the Keylon Hollow Road location. He said that although

---

[3]The photograph shows two pairs of scissors and three pairs of pliers.

he had the authority to direct that items be tested, he did not believe anything was safe enough to be tested, did not order any testing, and did not conduct any field tests. He agreed there was a public dump in the area between Keylon Hollow Road and Blue Springs Circle. No methamphetamine was cooked at the Keylon Hollow Road location. From the scene, he called Deputy Mayes, gave him the name on the box, and told Mayes what he had found. He and Deputy Mayes believed the two sites were connected due to Carmack's name appearing on the box and her being the owner of the Defendant's residence, the same fertilizer being found at both locations, and the similarity of the plastic bottles used. Detective Walker later learned that the cookware at the Defendant's residence matched that depicted on the Mirro box at the Keylon Hollow Road location.

Detective Walker stated that he estimated the quantities of the items he found at the Keylon Hollow Road site. He stated that he tried not to come into contact with the items because mixed hazardous liquids like he found can react to air. Detective Walker did not think that Eagle weighed the items before they were destroyed. He did not know the date that the items were destroyed.

ATFE Agent Dennis Kennamer testified that on April 24, 2009, Deputy Mayes called him regarding an investigation at the Defendant's residence. Deputy Mayes said he had found ammonium nitrate at the residence, that the Defendant was a member of the Aryan Nation, and that the Defendant had been in prison. When Agent Kennamer responded to the scene, where he determined that the ammonium nitrate from a cold pack had not been mixed with fuel and was not of "explosive grade." He did not conduct any tests but smelled and felt the ammonium nitrate to determine that it had not been mixed with fuel. Thus, he determined that the ammonium nitrate was not an explosive. Also, Agent Kennamer state that the fertilizer on the premises was agricultural

grade.

## III.  FINDINGS OF FACT

Based upon the evidence and exhibits presented, the Court makes the following factual findings with regard to this case:

On April 24, 2009, Roane County Sheriff's Deputy John Mayes responded to the Defendant's residence at 401 Blue Springs Circle to investigate a complaint of a methamphetamine laboratory on the premises.  During a search of the residence, Deputy Mayes found a plastic baggie with white residue and glass pipes that field tested positive for methamphetamine.  He also found two quart-sized baggies containing a substance, which the Defendant told him was the contents of a cold pack.  Based upon this information, Deputy Mayes knew the substance was ammonium nitrate.  Deputy Mayes also found sodium hydrochloride, empty blister packs, coffee filters, parts of batteries, and a thirty-two ounce Powerade bottle containing chemicals and lithium strips.  Coleman fuel and fertilizer were also found on the premises.  While processing this evidence, Deputy Mayes wore protective gloves and also wore a respirator part of the time.  Deputy Mayes retained the plastic baggie with white residue and the glass pipes for testing but decided to destroy the remaining items pursuant to DEA policy and his training and experience.  Deputy Mayes contacted the DEA for an appropriations number and a hazardous waste contractor to collect the items to be destroyed.

While the search of the Defendant's home was in progress, Deputy Mayes received a call about another complaint of a methamphetamine laboratory on Keylon Hollow Road.  Deputy Mayes contacted Roane County Sheriff's Detective Bryan Walker to respond to this complaint.  At

431 Keylon Hollow Road, Detective Walker found two cardboard boxes, a blue duffle bag, and a white plastic trash bag that had been abandoned three to five feet from the shoulder of the road. Detective Walker determined that the contents of the boxes and bags were the components of a "one-pot method" methamphetamine "cook" and that the items were not safe due to the presence of mixed hazardous and/or flammable liquids. Detective Walker also noticed that one of the boxes bore a shipping label with the name Geraldine Carmack and the address 385 Blue Springs Circle. Detective Walker called Deputy Mayes to report his findings, and the two officers determined that the methamphetamine components at the two locations were related to each other.

Deputy Mayes requested that the Tennessee Methamphetamine Task Force truck respond to the Keylon Hollow Road site. He also called the DEA and told them that the methamphetamine laboratory at the Defendant's residence and the methamphetamine components abandoned on Keylon Hollow Road were related. He was permitted to use the same appropriations number for each. The DEA sent Eagle Environmental, a company that disposes of hazardous materials, to collect the materials from both locations.

After the Methamphetamine Task Force truck arrived at the Keylon Hollow Road site, Detective Walker put on protective gear and processed the materials by removing them from the boxes and bags, photographing them, and creating a handwritten inventory of the items. The items found included a plastic bag containing the contents of a cold pack or lye, a plastic bag containing fertilizer, coffee filters, plastic baggies, scissors, a wrench, a plastic bottle containing a liquid with a tube coming from the cap, a strainer, salt, a funnel, two rolls of black tape, thirty-two ounces of lye, twenty straws, tubing, and Coleman fuel. Detective Walker determined that none of the items were safe to retain for testing or to field test. Kelly Johnson of Eagle Environmental

arrived, collected the items from Keylon Hollow Road, added them to the items that she had collected from the Blue Springs Road site, and transported them in sealed containers for disposal. All of the items believed to be methamphetamine components or equipment from both locations were destroyed except for the plastic baggie and glass pipes from the Blue Springs Road residence.

At some point on April 24, 2009, Dorris Lowe told Deputy Mayes that she had taken methamphetamine laboratory equipment from her home on Blue Springs Road and dumped it on Keylon Hollow Road.

# IV. ANALYSIS

The Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions be fundamentally fair. California v. Trombetta, 467 U.S. 479, 485 (1984). Fundamental fairness requires that the "criminal defendant be afforded a meaningful opportunity to present a complete defense." Id. To protect this right, the Supreme Court has held that the government violates due process when it withholds from the defendant favorable evidence that is "material either to guilt or punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). With regard to the preservation of evidence, the requirement that a trial be fundamentally fair does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Instead, the "duty [to preserve evidence] must be limited to evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488. Specifically, the exculpatory value of the evidence must be apparent before its loss or destruction, and the defendant must be unable to get comparable evidence by other reasonably available means.

Id. at 489. "The destruction of materially exculpatory evidence violates due process regardless of whether the government acted in bad faith." United States v. Wright, 260 F.3d 568, 570 (6th Cir. 2001); see also Youngblood, 488 U.S. 51, 57 n.1 (observing that due process, "as interpreted in Brady, makes the good or bad faith of the [government or law enforcement] irrelevant when the [government] fails to disclose to the defendant material exculpatory evidence").

The Supreme Court created a different test with regard to potentially exculpatory evidence, which is evidence that if subjected to testing might or might not show the defendant's innocence. Id. at 571. For the destruction of "potentially useful evidence" to violate due process,

> the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means.

United States v. Jobson, 102 F.3d 214, 218 (6th Cir. 1996); see Youngblood, 488 U.S. at 57-58; Trombetta, 467 U.S. at 488-89; see also Wright, 260 F.3d at 571.

In the present case, the Defendant contends that the Government violated his rights to due process and a fair trial because Roane County Sheriff's officers destroyed evidence which the Government now claims was methamphetamine components and equipment. He argues that Deputy Mayes and Detective Walker acted in bad faith by destroying the items and denying the Defendant the ability to test them to show that they were not methamphetamine components. The Government admits the evidence at issue was destroyed but contends that its destruction does not amount to a due process violation because the items were destroyed pursuant to DEA policy. The Court turns briefly to which test is appropriate and then to the application of that test.

## A.  Nature of the Destroyed Evidence

The Court first examines whether the destroyed evidence is materially exculpatory or only potentially useful.  The following evidence was destroyed from the Defendant's residence: two quart-sized baggies containing ammonium nitrate, a thirty-two ounce Powerade Bottle containing chemicals and lithium strips, sodium hydrochloride, empty blister packs, coffee filters, parts of batteries, Coleman fuel and fertilizer.  The following was destroyed from the Keylon Hollow Road location: Two cardboard boxes, a blue duffle bag, a white plastic trash bag, a plastic bag containing ammonium nitrate, a plastic bag containing fertilizer, coffee filters, plastic baggies, scissors, a wrench, a plastic bottle containing a liquid with a tube coming from the cap, a plastic strainer, salt, a funnel, two rolls of black tape, thirty-two ounces of lye, twenty straws, tubing, and Coleman fuel.  The Defendant argues that he could have tested these materials to prove that they were not methamphetamine components.

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985); see also Hamblin v. Mitchell, 354 F.3d 482, 495 (6th Cir. 2003). In contrast, potentially useful evidence is that evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57.  The Supreme Court distinguished this type of evidence from that which is both exculpatory on its face and material to the defense because the Court recognized the inherent difficulty in "'divining the import of materials whose contents are unknown and, very often, disputed.'" Id. at 58 (quoting Trombetta, 467 U.S. at 486).

In the present case, the Court finds that the destroyed evidence was only potentially

useful, rather than obviously material and exculpatory.[4]  The usefulness of the destroyed items to

the defense lies in their ability to be tested.  The one exception to this is the Dell cardboard box,

which had a shipping label with the name and address of someone other than the Defendant.

Although the actual box has been destroyed, the Defendant has a clear photograph of the shipping

label.  Thus, the exculpatory feature of the Dell cardboard box has been preserved.   Because the

items destroyed were only potentially useful, the Court finds that the Youngblood test applies in this

case and the Defendant must show that law enforcement acted in bad faith in destroying the

evidence.


## B.  Youngblood Test

Whether the destruction of potentially useful evidence violates due process is

analyzed under a three-part test, which places the burden on the defendant to demonstrate "(1) that

the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value

of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such

that the defendant would be unable to obtain comparable evidence by other reasonably available

means."  Jobson, 102 F.3d at 218.  The first and second parts of this test–bad faith and obviousness

of exculpatory value–are tied together:  "The presence or absence of bad faith by the police for

---

[4]The Court notes that at some point on April 24, 2009, the Defendant's wife told Deputy
Mayes that she took methamphetamine laboratory equipment from her residence and abandoned it
on Keylon Hollow Road.  It is not clear that the investigating officers learned this before they
designated the evidence at issue for destruction, so the Court has not relied upon this fact in its
analysis of the exculpatory nature of the evidence.   Nevertheless, Mrs. Lowe's statement
corroborates the officers' testimony that they did not believe the evidence to be exculpatory and
Detective Walker's testimony that, in fact, he found it to be inculpatory as it was evidence of a
methamphetamine laboratory.

purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed":

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

Youngblood, 488 U.S. at 58. Negligence or even gross negligence on the part of the government does not amount to bad faith. Jobson, 102 F.3d at 218.

At the October 8 hearing, the Defendant argued that Deputy Mayes and Detective Walker had the sole decision making authority over which evidence to seize, to test, and to destroy. He contends that the exculpatory value of the evidence was readily apparent because testing the evidence was the only way the Defendant could show that the items are not the particular chemicals or components that the officers assumed that they were. He maintains that the Court can infer bad faith when officers decide to deny a defendant the opportunity to test evidence.

The Government responds that the evidence was photographed, inventoried, and transported for destruction on the day it was found, consistent with DEA policy for handling methamphetamine laboratories. It contends that the destruction of evidence pursuant to standard procedures because it is a threat to safety is not bad faith.

The Court finds that Deputy Mayes and Detective Walker intentionally designated the items they determined were methamphetamine components or equipment for destruction

pursuant to DEA policy because the officers determined that the items were not safe to store or test. Special DEA Agent Rust testified that pursuant to DEA policy, an officer processing a methamphetamine laboratory may only take samples of controlled substances and non-hazardous materials. He stated that all other items at a methamphetamine laboratory are deemed to be hazardous or contaminated and must be destroyed. In fact, law enforcement officers are prohibited from taking hazardous items from the scene of a methamphetamine laboratory. Deputy Mayes testified that he made the decision to destroy certain items found at the Blue Springs Circle residence based upon his training, his experience in investigating some 150 methamphetamine laboratories, and DEA policy. Detective Walker testified that he did not think any of the items found at the Keylon Hollow Road location were safe enough to be tested. He stated that he tried not to come into contact with the items because they contained mixed hazardous liquids which can react to air. He also said that he found evidence of the "one-pot method" of methamphetamine manufacturing, including a "gas generator," at the Keylon Hollow Road site. He testified that the "one-pot method" was dangerous because it could explode.

Nothing in the record indicates that Deputy Mayes or Detective Walker Officer or the other officers involved had any animus against the Defendant or any personal interest in sabotaging his defense. See Wright, 260 F.3d at 571 (observing that "[t]he record contains no allegation of official animus toward [the defendant] or of a conscious effort to suppress exculpatory evidence"). Instead, both Deputy Mayes and Detective Walker were acting pursuant to the standard operating procedures for handling methamphetamine laboratories. Destruction of evidence pursuant to police policy relating to officer and public safety does not constitute bad faith. See Jobson, 102 F.3d at 218 (finding that the police department did not act in bad faith in destroying dispatch tape

18

pursuant to "routine police department policy").

In United States v. Kearns, the District Court of Kansas examined whether the destruction of alleged methamphetamine laboratory components violated due process. 109 F. Supp. 2d 1309, 1317 (D. Kan. 2000). Defendant Kearns argued that the destruction of the alleged components by law enforcement violated his due process rights because he could not independently test the items. Id. The Court found that the Defendant had failed to show that the officers acted in bad faith:

> The evidence showed that these materials were destroyed because of their hazardous and volatile nature. This is, of course, a valid basis for the actions of the law enforcement officers. We note, in addition, that the overall circumstances also fail to suggest bad faith by the government. Samples of a number of the seized chemicals were taken and photographs were taken of all of the seized materials. The evidence also shows that the evidence was destroyed pursuant to court order or departmental policy.

Id. Accordingly, the district court denied the defendant's motion to dismiss the indictment. Id.

The Court finds that the same reasoning applies in the instant case. The evidence shows that the components destroyed were hazardous and potentially volatile. Although only the plastic baggie with white residue and the glass pipes from the Defendant's residence were retained for testing (and presumably remain available for the Defendant to test as well), photographs were taken of the destroyed items from both sites. Finally, the evidence shows that the officers designated the items for destruction pursuant to DEA policy in which they were trained.

The Court also finds that nothing about the items (other than the shipping label discussed above) were apparently exculpatory to the officers. In fact, the officers believed the items to be inculpatory–evidence of the manufacture of methamphetamine–and seized them for that

reason.[5]

      Finally, the Court turns briefly to the third prong of the <u>Youngblood</u> test, the Defendant's access to comparable evidence by other reasonably available means. Although the Defendant cannot conduct testing to identify any of the unknown liquids or bags of solids that were destroyed, he has photographs of all of the items found at both locations. With regard to items with labeled packaging or containers, such as the salt and the Coleman fuel, or items that are readily identified, such as the coffee filters, tape, and scissors, the Defendant can argue that these items were not methamphetamine components, as assumed by the officers, by using the photographs as well as he could with test results. Additionally, the Defendant has a photograph of the shipping label on the Dell box, which permits him to dispute the Government's contention that he owned the materials found at Keylon Hollow Road. The Court finds that the destruction of the evidence in the instant case does not vitiate the Defendant's stated defense that the items found at Keylon Hollow Road were placed there by someone else, did not belong to the Defendant, and the Defendant had no knowledge of them.

      In light of the absence of bad faith on the part of law enforcement or the Government, the lack of evidence that law enforcement was aware that the items destroyed possessed any exculpatory value, and the availability of other evidence relating to the ownership of the items from Keylon Hollow Road, the Court concludes that the destruction of the evidence at issue did not violate the Defendant's rights to due process and a fair trial. Accordingly, the Court recommends

---

[5]Again, the Court notes that Mrs. Lowe's statement that she abandoned methamphetamine laboratory equipment from her Blue Springs Road residence at Keylon Hollow Road corroborates the officers' testimony that they believed the destroyed evidence to be the components of a methamphetamine laboratory.

that the Defendant's request for dismissal of Count Three and other restriction of the Government's evidence be denied.

## V.  CONCLUSION

After carefully considering the evidence, the parties' arguments, and the relevant legal authorities, the Court finds no basis to dismiss Count Three of the Superseding Indictment or for other sanctions against the Government.  For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motion to Dismiss Count Three of the Indictment and for Other Sanctions Against the Government for Destruction of Evidence [**Doc. 68**] be **DENIED**.[6]

Respectfully submitted,

___ s/ C. Clifford Shirley, Jr. ___
United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).