IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
v.                              )          No. 3:09-CR-110
                                )
JERRY KAY LOWE, JR.,            )          (PHILLIPS/SHIRLEY)
                                )
            Defendant.          )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.  This case is before the Court on the Defendant's Motion to Suppress

All Oral Statements Made by Defendant [Doc. 67], filed on September 10, 2010.  The Court held

an evidentiary hearing on this motion on October 4, 2010, and continuing on October 8, 2010.

Assistant United States Attorney A. William Mackie appeared on behalf of the Government.

Attorney Robert R. Kurtz represented the Defendant, who was also present.  At the conclusion of

the hearing, the undersigned took the motion, the briefs, and the evidence under advisement.

## I.  POSITIONS OF THE PARTIES

On August 24, 2010, the Defendant was charged in a Superseding Indictment [Doc.

57], which alleges that he was a felon in possession of ammunition on April 24, 2009 (Count One);

was a felon in possession of a firearm in April 2009 (Count Two); and possessed equipment,

chemicals, products, and materials, which can be used to manufacture methamphetamine, on April

1

24, 2009, knowing and intending that such materials would be so used (Count Three).

The Defendant asks [Doc. 67] the Court to suppress statements he made to law enforcement on April 24, 2009, and May 22, 2009, because those statements were taken in violation of his rights under the Fifth and Sixth Amendments. He contends that officers questioned him on April 24, 2009, during a search of his home, without giving him the <u>Miranda</u> warnings. He argues that the interrogation on May 22, 2009, was a continuation of the initial unconstitutional interrogation on April 24, 2009, and that the May 22 statement was not voluntarily given because the interviewing officers failed to reveal that he was the target of a federal investigation. Additionally, he asserts that officers interrogated him on May 22, 2009, despite the fact that he was represented by counsel on an unrelated criminal case.

The Government responds [Doc.72] that both statements were voluntarily made and were free of any coercion by law enforcement. It argues that the Defendant was not in custody at the time of the April 24, 2009 statement, so the interviewing officers were not required to advise him of the <u>Miranda</u> warnings. It asserts that the Defendant made the May 22, 2009 statement independently from the earlier statement. It contends that the Defendant initiated the May 22 statement, chose the location, and waived his <u>Miranda</u> rights before making it. The Government maintains that although the Defendant's Sixth Amendment right to counsel had not attached with regard to the subject matter of the May 22 statement, the Defendant consulted with counsel representing him on another matter during the interview and chose to proceed. Accordingly, it urges the Court to deny the Defendant's request that the statements be suppressed.

## II. SUMMARY OF TESTIMONY

The Government presented the testimony of Roane County Sheriff's Deputy John Mayes; Alcohol, Tobbaco, Firearms, and Explosives (ATFE) Agent Dennis Kennamer; and ATFE Agent Jason Dobbs.[1]

Roane County Sheriff's Deputy John Mayes testified that between 11:00 a.m. and 12:00 p.m., on April 24, 2009, he and Deputy Charles Cissom went to the Defendant's home at 401 Blue Springs Circle to investigate a report of a methamphetamine laboratory on the premises. At the residence, he parked on the street. Mrs. Dorris Lowe, the Defendant's wife, answered the door, and Deputy Mayes identified himself and why he was there. Mrs. Lowe said that she would have to get her husband. The Defendant came to the door, and Deputy Mayes again identified himself and his purpose. He asked for permission to search the home and told the Defendant that he intended to search for drugs, including methamphetamine. He told the Defendant that he did not intend to arrest anyone, unless he found 500 pounds of marijuana.

Deputy Mayes stated that he conducted a search of the Defendant's residence, pursuant to the Defendant's consent. The Defendant led the officers through the house. During the search, Deputy Mayes never told the Defendant that he was under arrest or restrained or handcuffed him. He did not prevent the Defendant from making telephone calls while the search was proceeding, and he allowed the Defendant to go outside to smoke. Deputy Mayes testified that he and ATFE Agent Kennamer interviewed the Defendant at his home that day. Deputy Mayes asked

---

[1]The Government also presented the testimony of Roane County Sheriff's Detective Bryan Walker, whose testimony was relevant to the Defendant's Motion to Dismiss Count Three of the Indictment [Doc. 68]. On cross-examination, Detective Walker stated that he may have spoken to the Defendant and Dorris Lowe "in passing" at their home on April 24, 2009, but that he did not take any statements from them.

the Defendant if he understood that he was not under arrest. The Defendant said they had been very fair and professional. He did not arrest the Defendant that day, and the Defendant subsequently left the house with his father.

On cross-examination, Deputy Mayes testifed that he arrived on the scene at 11:17 a.m. on April 24, 2009. He stated that the consent to search form was signed at 11:36 a.m. Deputy Mayes did not recall asking the Defendant to stay in the living room during the search. He did ask the Defendant to sit down and relax while the officers were processing the evidence. He agreed that Mrs. Lowe was handcuffed during the search. He stated that while the Defendant and Mrs. Lowe were in the living room, he engaged in "general conversation" with them. He stated that the Defendant was free to leave during the search. He did not know if the Defendant had his wallet on his person, but he recalled that the Defendant did have keys to a safe. He agreed that a photograph taken the day of the search revealed what could be the Defendant's key fob in a box in his bedroom. Deputy Mayes stated that the Defendant "passed out" while he was processing the evidence. He agreed that he kept an eye on the Defendant while the Defendant was at the well house but stated that the Defendant was free to have visitors or to leave.

ATFE Agent Dennis Kennamer testified that on April 24, 2009, Deputy Mayes called him regarding an investigation at the Defendant's residence. Deputy Mayes told Agent Kennamer about ammonium nitrate on the premises, that the Defendant was a member of the Aryan Nation, and that the Defendant had served a prison sentence. Agent Kennamer and Agent Jason Dobbs responded to the scene to examine the ammonium nitrate. Agent Kennamer said that when they arrived at the Defendant's residence in the early afternoon, he saw several police cars parked in the driveway and on the road. He also saw law enforcement officers and other people outside the

Defendant's home. Deputy Mayes briefed the ATFE agents, explaining why the Roane County Sheriff's Department was there and what they had found.[2] Agent Kennamer determined that the ammonium nitrate was from a cold pack, had not been mixed with fuel, and was not of an "explosive grade."

Agent Kennamer stated that he interviewed the Defendant at 2:30 p.m. and that Agent Dobbs interviewed Mrs. Lowe. He said that the Defendant was not under arrest and could roam about the house during the search. Agent Kennamer, who was in plain clothes, told the Defendant that he was an ATF agent and that he would like to talk to him. He and the Defendant began talking on the front porch but moved to the side porch when it got too hot. At one point Agent Kennamer took a break in the interview to meet with Agent Dobbs, and after learning what Mrs. Lowe was saying, Agent Kennamer decided to record the Defendant's statement. He told the Defendant that he was not under arrest and was free to leave three times, two of which occurred during the recorded statement. The Defendant was very cordial and polite during the interview. When Agent Kennamer asked the Defendant what he did in the Aryan Nation, the Defendant refused to tell because it was against the group's bylaws to discuss it. The Defendant also declined to answer other questions as well. The Defendant, who was waiting on his father to pick him up, was never restrained from leaving. Later, the Defendant left with his father.

---

[2]The Court notes that at a suppression hearing on February 1, 2010, Deputy Mayes testified that he found ammunition, marijuana roaches, a "meth pipe," Coleman fuel, ammonia nitrate, and a trash bag containing "components consistent with methamphetamine manufacturing" in the April 24, 2009 search of the Defendant's house. At the subsequent evidentiary hearing on October 4, 2010, Deputy Mayes testified that he found a plastic bag with a white residue and glass pipes, both of which field tested positive for methamphetamine; marijuana; Xanax; ammonia nitrate; a Powerade bottle containing chemicals and lithium strips; sodium hydrochloride; empty blister packs; coffee filters; and parts of batteries.

Agent Kennamer identified a recording [Exh. 5A] of the Defendant's statement, which was played for the Court. On the tape, the Defendant agrees that he understands that he is not under arrest and is free to go in the house or to leave. Agent Kennemer testified that he did not advise the Defendant of the Miranda warnings because the Defendant was not in custody. The interview occurred just outside the Defendant's house. The Defendant was told that he was free to leave, but he chose to stay. Agent Kennamer also testified about the transcript [Exh. 5B] of the Defendant's recorded statement. The transcript shows that at the end of his statement, the Defendant agreed that no threats or promises had been made to him and that he was making the statement of his own free will.

On cross-examination, Agent Kennamer testified that two police cars–Deputy Mayes' K-9 car and another police car–were in the Defendant's gravel driveway when he arrived. He did not recall whether the Defendant had a car in the driveway but was shown a photograph [Exh. 8] depicting the Defendant's car parked in the gravel driveway beside the house. Agent Kennamer said the ammonium nitrate in the Defendant's home was from a cold pack. He examined the ammonium nitrate at the scene and determined by its smell and feel that it did not have fuel mixed with it. He began the recorded portion of the Defendant's statement at 3:12 p.m. Although he could not recall how long he and the Defendant had been talking before he began recording the interview, he stated that he had taken handwritten notes during that part of the interview. The Defendant's wife was interviewed by Agent Dobbs at a separate location, and the Defendant did not overhear that interview. Agent Kennamer did not recall telling the Defendant that he could not speak with or meet his father until after his interview. Agent Kennamer said that he may have spoken briefly and informally with the Defendant's father that day. The Defendant was allowed to leave with his father

as soon as he wanted to do so.  Although Agent Kennamer did not tell the Defendant that he had "criminal exposure," he did advise the Defendant that there might be charges down the road.

ATFE Agent Jason Dobbs testified that on April 24, 2009, he was involved in an investigation of the Defendant.  He did not interview the Defendant on that day, but he introduced himself to the Defendant and informed the Defendant that he was with the ATFE.  Sometime the following week, the Defendant called the ATFE office and asked to speak with either him or Agent Kennamer.  The Defendant left a message that he had information to give them.  Agent Dobbs returned the Defendant's call, and the Defendant said he had information on other criminal activity and offered to work as an informant.  During this telephone conversation, Agent Dobbs set up a time to meet with the Defendant.  Although he subsequently spoke with the Defendant by telephone several times, the Defendant did not show up for their meetings.

Agent Dobbs stated that on May 22, 2009, he spoke with the Defendant by telephone again, and the Defendant told him that he was having trouble coming to Knoxville to meet with him. The Defendant told Dobbs that he was scheduled to be in court in McMinn County.  Agent Dobbs offered to meet him at the courthouse.  Agent Dobbs and Agent Wade Moore arrived at the McMinn County Courthouse, and the Defendant called Agent Dobbs' cellular telephone and said he was there at the courthouse in his car with his wife.  When Agent Dobbs entered the lobby of the courthouse with the Defendant, the Defendant said he knew of a conference room where they could meet. Agent Dobbs, Agent Moore, and the Defendant went in the conference room.  Although the Defendant said he could read, Agent Dobbs read an Advice of Rights and Waiver form [Exh. 6] to the Defendant.  The Defendant initialed each of the rights set out on the form and signed the form. Agent Moore also signed the form as a witness and entered the time of 12:40 p.m.  Agent Dobbs

stated that although the Defendant was not in custody at this time, he decided to have the Defendant execute the rights waiver just "to be safe."

Agent Dobbs testified that he did not prevent the Defendant from leaving or block the door during the interview. He said the purpose of the meeting was for the Defendant to provide information about other people. Agent Dobbs asked the Defendant about firearms. Three quarters of the way through the meeting, the Defendant's attorney, who represented him on drug charges in McMinn County, came into the room. The agents introduced themselves to the attorney. The attorney and Mr. Lowe met briefly in the hallway. The Defendant and his attorney came back into the room, and the Defendant continued with the interview. The Defendant's attorney remained in the room for the rest of the meeting.

On cross-examination, Agent Dobbs testified that he interviewed the Defendant's wife and Geraldine Carmack on April 24, 2009, but not the Defendant. He never questioned the Defendant on the telephone. He agreed that he initiated some of the telephone calls to the Defendant. The Defendant told Agent Dobbs that he intended to cooperate. Agent Dobbs was aware that the Defendant was at the McMinn County Courthouse on May 22, 2009, on local drug charges and that the Defendant was represented by an attorney. Agent Dobbs did not ask the Defendant's attorney for permission to interview him. The interview took place in a large conference room, and Agent Dobbs said that they may have closed the door to the room for privacy. Agent Moore sat across from the Defendant, and Agent Dobbs sat between them. The door was near the Defendant to the right.

Agent Dobbs stated that during the interview on May 22, 2009, he gave the Defendant a form on which to write his statement, but after the Defendant spoke with his attorney,

the Defendant did not want to give a written statement and kept the form when he left. Agent Dobbs did not record the May 22 statement because it was a "cooperation interview." Agent Dobbs agreed that they discussed other topics besides the information the Defendant wanted to provide and said that he asked the Defendant what guns he had possessed. He told the Defendant that he could not promise that the Defendant would not be charged with regard to the firearms that the Defendant mentioned. He agreed that he wanted the Defendant to cooperate. At the time of the May 22 interview, Agent Dobbs had already spoken with the United States Attorney and knew that the Defendant was under investigation. Despite this knowledge, Agent Dobbs did not tell the Defendant that he was the target of an investigation, during the interview on May 22.

### III. FINDINGS OF FACT

Based upon the evidence from the evidentiary hearings on February 1, October 4, and October 8, 2010, and the exhibits presented, the Court makes the following factual findings with regard to this case:

At 11:17 a.m., on April 24, 2009, Roane County Sheriff's Deputies John Mayes and Charles Cisson responded to the Defendant's residence at 401 Blue Springs Circle to investigate a complaint of a methamphetamine laboratory on the premises. The Defendant invited the officers into his home and consented to a search of his residence. The Defendant was not handcuffed or restrained during the search, but after initially leading the officers in a "sweep" through the house, he waited in the living room, where he fell asleep during the search. His wife waited with him in the living room and was handcuffed at one point, because the officers believed that she was trying to destroy or hide evidence. In the early afternoon, ATFE Agents Dennis Kennamer and Jason

Dobbs arrived at the Defendant's residence to examine ammonium nitrate found there. After determining that the ammonium nitrate was not an explosive, Agent Kennemar began interviewing the Defendant on the front porch of his residence at 2:30 p.m. Agent Kennamer identified himself as an ATFE agent and said he would like to talk with the Defendant. The Defendant agreed to speak with Agent Kennamer, who told the Defendant that he was not under arrest.

The first portion of Agent Kennamer's interview with the Defendant was not recorded, and at some point, Agent Kennamer and the Defendant moved to the side porch because the front porch had become too hot. During a break in the interview, Agent Kennamer talked with Agent Dobbs, who was interviewing the Defendant's wife at a separate location in the house. After learning what Mrs. Lowe was saying in her interview, Agent Kennamer decided to record the remainder of his interview with the Defendant. The recorded interview was conducted by both Agent Kennamer and Deputy Mayes. Agent Kennamer began recording the interview at 3:12 p.m. At the beginning of the recorded portion of the interview, the Defendant agreed that he understood that he was not under arrest. Agent Kennamer told the Defendant that he was free to go into his house or to leave. During the recorded portion of the interview, the Defendant stated that he had been arrested before and declined to answer questions relating to his membership in the Aryan Nation. At the end of the interview, which concluded at 3:30 p.m., the Defendant again affirmed that he understood he was not under arrest. Agent Kennamer told him that he was free to leave, and the Defendant agreed that he gave the interview of his own free will. The Defendant subsequently left the residence with his father.

Within a week of the April 24, 2009 search and interview, the Defendant called the ATFE office and left a message for Agents Kennamer and Dobbs stating that he wanted to provide

information on other criminal activity. Agent Dobbs returned the Defendant's call and attempted to schedule a meeting with him over a series of telephone conversations, but the Defendant missed several scheduled meetings. On May 22, 2009, Agent Dobbs again spoke with the Defendant by telephone, and the Defendant said he was having trouble coming to Knoxville for a meeting. The Defendant mentioned that he had a court appearance that day in McMinn County, and Agent Dobbs offered to meet him at the McMinn County Courthouse.

Agents Dobbs and Wade Moore arrived at the McMinn County Courthouse, and the Defendant called Agent Dobbs on his cellular telephone and told Agent Dobbs that he was there at the courthouse in his car with his wife. The agents and the Defendant met in the lobby and began looking for a place to talk. The Defendant suggested that they meet in a conference room and led them there. During the interview, the door to the conference room was closed, but the Defendant's path to the door was not blocked by the agents. Before the interview began, Agent Dobbs advised the Defendant of his Miranda rights by reading a rights waiver form to him. The Defendant initialed each of the rights and signed the waiver. Agent Moore signed the waiver as a witness. Agent Dobbs then interviewed the Defendant about the information the Defendant sought to provide and about his possession of firearms. Agent Dobbs did not inform the Defendant that he was the subject of a federal investigation. Three quarters of the way through the interview, the Defendant's attorney, who represented him on the McMinn County drug charges, entered the room and then met with the Defendant privately in the hallway. The Defendant and his attorney returned to the conference room, and the Defendant completed the interview in his attorney's presence. After meeting with his attorney, the Defendant no longer wanted to provide a written statement in addition to his oral statement.

# IV. ANALYSIS

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).  To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation.  Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003).  "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003).  The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); Swanson, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the circumstances to ascertain a reasonable person's understanding of the situation.  Salvo, 133

F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. Swanson, 341 F.3d at 529. Other factors useful in making this determination are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

Salvo, 133 F.3d at 950; see also United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010); United States v. Panak, 552 F.3d 462, 465 (6th Cir. 2009); Swanson, 341 F.3d at 529.

### A. April 24, 2009 Statement

The Defendant argues that the circumstances surrounding the April 24, 2009 statement show that he was in custody and, thus, that the Miranda warnings were required. He contends that officers had been at his house for over three hours at the time of the recorded interview and that Agent Kennamer spoke with him for an hour, although only the final eighteen minutes were recorded. Additionally, he asserts that his movements were restricted and he was not free to leave because he did not have access to his keys or wallet inside the house where the search was occurring and because the officers' cars were blocking his car from leaving. Moreover, he contends that his car was searched and subsequently towed from the premises. Accordingly, he argues that he was not free to leave.

The Court reviews the totality of the circumstances surrounding the April 24, 2009

statement to determine whether the Defendant was in custody. Based upon the initial complaint of a methamphetamine laboratory on the premises and the items discovered during the search, Agent Kennamer and Deputy Mayes interviewed the Defendant on the porch of his home in order to investigate the ammunition and the perceived methamphetamine components found in the Defendant's residence.[3] The Court finds that the location of the interview, the porch of the Defendant's house, was neither hostile nor coercive:

> If a home is a "castle," 3 W. Blackstone, Commentaries on the Laws of England 288 (1768), a secure redoubt from the cares of the world, it presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. It is the rare homeowner who has not exercised these types of control at some point in encountering

---

[3]Although one of the factors that the Court may consider is the officers' purpose in questioning the Defendant, Salvo, 133 F.3d at 950, the Court finds that the officers' purpose in this case–the continued investigation of illegal items found in the Defendant's home–does not illuminate the issue of whether the Defendant was in custody at the time he made the April 24, 2009 statement. Arguably, the purpose of investigating the person's involvement in criminal activity would be a circumstance tending to indicate that the interview was custodial. Compare Coomer v. Yukins, 533 F.3d 477, 486 (6th Cir. 2008) (recognizing that the purpose of the questioning–to focus the investigation on the defendant–could support a determination that the interview was custodial), with United States v. Wright, 220 F. App'x 417, 421 (6th Cir.) (observing that the purpose of the questioning–"to quickly confirm or dispel the officer's suspicion of criminal activity" following a Terry stop– suggested that the defendant was not in custody), cert. denied 552 U.S. 879 (2007); United States v. Robinson, 217 F. App'x 503, 508-09 (6th Cir.) (holding that the purpose of the questioning–the officer's safety interest in determining the location of firearms– was not coercive), cert. denied 552 U.S. 846 (2007); United States v. Flores, 193 F. App'x 597, 606 (6th Cir. 2006) (concluding that reason for questioning–officers in the defendant's home looking for another person, not to investigate the defendant–was a circumstance showing the defendant was not in custody); United States v. Hollie, No. 98-1103, 1999 WL 1021860, *5 (6th Cir. Nov. 3, 1999) (finding the fact that the officers questioned the defendant because he reported being a victim of a crime showed that the interview was not custodial), cert. denied 528 U.S. 1197 (2000). In the present case, however, the Court finds that the officers' purpose in questioning the Defendant neither supports nor contradicts a finding that the Defendant was free to leave, because the Defendant was repeatedly advised during the questioning that he was not under arrest, nor would he be arrested that day.

> uninvited visitors. No doubt, some individuals may find it more
> difficult to do these things during a visit by the police. But all
> individuals, the meek and the brazen alike, generally will find it
> easier to exercise such control on their home turf than at the station
> house.

Panak, 552 F.3d at 465-66 (observing that generally an interview in ones home is deemed to be non-

custodial); see also Hinojosa, 606 F.3d at 883. In the present case, the Defendant invited the

Deputies Mayes and Cissom into his home, consented to the search, and led them through the house

during the initial sweep. He fell asleep in the living room during the search. He went out of the

house to the well house and, ultimately, spoke with Agent Kennamer on the front and side porches.

During the interview, the Defendant declined to answer questions about his role in the Aryan Nation.

These circumstances reveal the interview to be non-custodial. See id. (finding the defendant's

refusal to consent to an extended search of his home to suggest that the interview was not coercive).

Moreover, the Court finds that the Defendant was informed at the start of the

interview and again at the beginning of the recorded portion of the interview that he was not under

arrest and that he could leave. Although Agent Kennamer initiated the interview by asking to speak

with the Defendant, the Defendant complied with this request and subsequently agreed that he gave

the interview of his own free will. Agent Kennamer described the Defendant as polite and cordial.

Deputy Mayes testified that the Defendant stated that the officers had been fair and professional.

Agent Kennamer was in plain clothes, and the record is devoid of evidence that any weapons were

displayed during the interview or during the entire time that law enforcement was at the house.

Although Agent Kennamer, who was later joined by Deputy Mayes, spoke with the Defendant over

the better part of an hour, the Court finds that the length and timing–a maximum of one hour during

the mid-afternoon–of the interview were not oppressive. Thus, the Court finds that the tone and

length of the interview also show it to be non-custodial.  See Panek, 552 F.3d at 467 (observing that an interview lasting between forty-five minutes and one hour "compares favorably with other encounters we have deemed non-custodial").

The Court also finds that the Defendant's movement was not restrained by the law enforcement officers present during the interview.  First, the Court notes that the Defendant was not physically restrained or handcuffed.  The officers did not limit the Defendant's freedom to move about his house or the grounds of his property.  See id. (finding that "the officers did not handcuff Panak or physically restrain her, and they did not otherwise limit her freedom of movement").  Although it does not appear that the Defendant could have driven away, he had spoken with his father and was waiting for his father to pick him up at the time he gave the statement.  These circumstances show that the Defendant was free to leave if he so chose and, in fact, did leave, when his father arrived.

Considering the totality of the circumstances, the Court finds that the Defendant was not in custody during the April 24, 2009 interview by Agent Kennamer and Deputy Mayes.  It is well-settled that a person is not entitled to be advised of the Miranda warnings when questioned in a noncustodial setting.  United States v. Warner, 971 F.2d 1189, 1201 (6th Cir. 1992) (holding that a statement was admissible despite the absence of Miranda warnings because the suspect was not in custody when interrogated).  Accordingly, the Miranda warnings were not required.


### B.  May 22, 2009 Statement

The Defendant argues that the May 22, 2009 statement was obtained in violation of his Fifth Amendment rights because it was the fruit of the earlier unconstitutional statement and

because the officers obtained the statement under the false guise of conducting a "cooperation interview" and did not inform him that he was the target of a federal investigation. He contends that the May 22 statement was also taken in violation of his Sixth Amendment right to counsel because the officers knew that he was represented by counsel at the time he made the statement.

The Government responds that the May 22, 2009 statement was not the product of police coercion because the Defendant requested the meeting with the agents, chose the time and location of the meeting, was advised of and waived his <u>Miranda</u> rights, and consulted with counsel during the course of the interview. Thus, it concludes that the second statement was voluntarily given. It also contends that the Defendant's Sixth Amendment right to counsel had not arisen at the time of the May 22, 2009 statement because he did not have any charges relating to the drugs or ammunition found at his home on April 24, 2009. Moreover, it points out that the Defendant did have the opportunity to meet with counsel during the May 22 interview and chose to proceed.

The Court disposes quickly of the argument that the May 22, 2009 statement was the fruit of an earlier unconstitutional statement. First, the Court has determined that the earlier statement was not unconstitutional. Second, the Court finds that even if the first statement were unconstitutional, the change in time and circumstances with regard to the second statement countered any taint from the first statement. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 311 (1985). "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." <u>Id.</u> In the present case, the second statement occurred nearly a month after the first at a time and location chosen by the Defendant. <u>See</u> <u>United States v. Daniel</u>, 932 F.2d 517, 521 (6th Cir. 1991) (holding that second statement taken one day

after the first was not tainted by any coerciveness present during the first interview). The Defendant requested the opportunity to provide information to the ATFE and was interviewed by different agents. Accordingly, the Court finds that nothing about the April 24, 2009 statement compromised the voluntariness of the May 22, 2009 statement.

The Court turns next to the Defendant's contention that the May 22, 2009 statement was not voluntarily given because the interviewing agents tricked him into disclosing incriminating information under the guise of a "cooperation interview." Even when the <u>Miranda</u> warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those <u>Miranda</u> rights before it may introduce an incriminating statement by a defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. <u>Id.</u> at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. <u>McCall v. Dutton</u>, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Connelly</u>, 479 U.S. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." <u>McCall</u>, 863 F.2d at 459 (citing <u>Connelly</u>, 479 U.S. at 163-64).

The Court finds that the agents' conduct leading up to and during the May 22, 2009

statement was not coercive. To assess whether a confession was voluntary, the Court must "examine 'the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine[ ] their psychological impact on an accused's ability to resist pressures to confess.'" United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991) (quoting United States v. Brown, 557 F.2d 541, 546 (6th Cir.1977)). In the present case, the Defendant contacted the ATFE, seeking to provide information, within a week of the April 24, 2009 statement during which Agent Kennamer had expressly warned that other charges might be forthcoming. During the April 24, 2009 statement, the Defendant acknowledged that he understood he was not suppose to possess firearms because he is a convicted felon. Immediately before the May 22 interview, the Defendant was read his Miranda rights and signed a written rights waiver. The Defendant was expressly advised that "[a]nything you say can be used against you in court." [Exh. 6] During the interview, Agent Dobbs told the Defendant that he could not promise that the Defendant would not be charged with regard to the firearms that the Defendant mentioned. Accordingly, the Court finds that Agent Dobbs did not trick the Defendant, even though he did not explicitly advise the Defendant that he was the target of a federal investigation. Thus, no police coercion was present during the May 22, 2009 interview.

Finally, although the Court has found that the predicate of police coercion is absent in this case, the Court also finds that the Defendant's will was not overborne by the actions or inaction of the interviewing agents. The Defendant instigated the interview and chose the time and location of the meeting. During the interview, the Defendant consulted with counsel and then chose to proceed with the interview, yet not to give a written statement. These facts reveal that the Defendant was acting of his own free will. Thus, the Court finds that the May 22, 2009 statement

was voluntarily given.

The Defendant also contends that his Sixth Amendment right to counsel was violated because the agents interviewed him despite knowing that he was represented by an attorney on the McMinn County drug charge. "[T]he Sixth Amendment right to counsel attaches only after judicial proceedings have been initiated against a defendant." Moran v. Burbine, 475 U.S. 412, 430 (1986). Moreover, the right to counsel under the Sixth Amendment is "'offense specific,'" meaning that "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." Texas v. Cobb, 532 U.S. 162, 167-68 (2001) (quoting McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)).

In the present case, although the Defendant was represented by counsel on an unrelated state drug charge, his Sixth Amendment right to counsel with regard to the possession of firearms (or ammunition) in April 2009 had not yet attached.[4] The Sixth Circuit has observed that a target of a federal investigation, who has not been arrested or formally charged, does not have a Sixth Amendment right to counsel with regard to the matter under investigation. United States v. Howard, 752 F.2d 220, 227 (6th Cir. 1985), vacated on rehg en banc on other gnds, 770 F.2d 57 (1985) (analyzing whether statements by coconspirators were made in furtherance of the conspiracy). Thus, Agents Dobbs and Moore could question the Defendant about his possession of firearms without the permission of his counsel on the unrelated state drug charge.

---

[4]The Court notes that the original Indictment [Doc. 3] in this case, which charges the Defendant with being a felon in possession of ammunition on April 24, 2009, was filed on August 18, 2009. The Superseding Indictment [Doc.57], which adds the charge that the Defendant was a felon in possession of firearms in April 2009, was filed on August 24, 2010.

In any event, as the Government observes, the Defendant consulted with his attorney on the state drug charge during the May 22, 2009 interview and, following this brief meeting with counsel, continued with the interview with his attorney present. Thus, the Defendant received the protections given by the Sixth Amendment right to counsel, even though that right had not yet attached.

Accordingly, the Court concludes that the Defendant's May 22, 2009 statement was voluntarily given and did not violate his rights under the Fifth or Sixth Amendments.

## V. CONCLUSION

After carefully considering the evidence, the parties' arguments, and the relevant legal authorities, the Court finds no basis to suppress either of the statements by the Defendant. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motion to Suppress All Oral Statements Made by the Defendant [**Doc. 67**] be **DENIED**.[5]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).